# Commission Marketer Agreement

## TABLE OF CONTENTS

| SECTION | PAGE |
|---|---|
| 1. GENERAL OBLIGATIONS | 1 |
| 2. TERM | 1 |
| 3. RIGHT TO USE FUEL FACILITY | 2 |
| 4. OTHER BUSINESS OPERATIONS | 2 |
| 5. PERSONAL ATTENTION TO OPERATION | 2 |
| 6. PERSONNEL AND TRAINING | 2 |
| 7. COMPENSATION | 2 |
| 8. SECURITY DEPOSIT | 2 |
| 9. CASH | 3 |
| 10. ACCOUNTING | 3 |
| 11. AUDITING | 4 |
| 12. OPERATING STANDARDS AND PROCEDURES | 4 |
| 13. HOURS OF OPERATION | 5 |
| 14. CUSTOMER ACCESS | 5 |
| 15. LICENSES AND PERMITS | 5 |
| 16. TRADE IDENTITIES | 5 |
| 17. COMPLIANCE WITH LAW | 6 |
| 18. LIABILITY | 6 |
| 19. INVENTORY MEASUREMENTS | 6 |
| 20. MAINTENANCE AND REPAIR | 6 |
| 21. TAXES | 7 |
| 22. UTILITIES | 7 |
| 23. TERMINATION AND NONRENEWAL | 7 |
| 24. INSURANCE | 8 |
| 25. NOTICE | 9 |
| 26. RELATIONSHIP OF PARTIES | 9 |
| 27. ASSIGNMENT, FIRST REFUSAL | 9 |
| 28. SUCCESSOR IN INTEREST DESIGNATION | 10 |
| 29. ENTIRE AGREEMENT | 11 |
| 30. WAIVER | 11 |
| 31. CONFIDENTIALITY | 11 |
| 32. FORCE MAJEURE | 11 |
| 33. SEVERABILITY | 11 |

EXHIBITS

☒ 1. MAINTENANCE

☐ 2. STATE ADDENDA

☐ 3. CONSENT TO ASSIGNMENT OF COMMISSION MARKETER AGREEMENT

☐ 4. OWNER'S GUARANTY AND ASSUMPTION OF OBLIGATIONS

S.S. Number
**1-00-03396-013**

SVB Number
**2219137**


bp

**Commission Marketer Agreement**
CMA (4-2003) W

THIS AGREEMENT dated ___03-26-04___ , is between **BP Products North America Inc.** a Maryland corporation with offices at ___28100 Torch Parkway, Suite 300, Warrenville IL 60555___
[Street Address, City, State, Zip Code]

("BP") and ___Hagop Baga___ with an address of
___341 Gorge Road, Cliffside Park NJ 0710___ ("Marketer").
[Street Address, City, State, Zip Code]

WHEREAS, BP owns or controls certain real estate located at
___341 Gorge Road, Cliffside Park NJ 0710___ upon which a retail sales facility is or shall be located (the "Facility") which includes a motor fuels sales facility (the "Fuel Facility"); and

WHEREAS, Marketer wishes to lease from BP and operate an independent business upon a portion of the Premises (the "Leased Premises") pursuant to a lease (the "Lease"); and

NOW THEREFORE IN CONSIDERATION OF the mutual covenants, conditions and promises contained in this Agreement, BP and Marketer hereby agree as follows:

**1.GENERAL OBLIGATIONS.** BP hereby engages Marketer as an independent contractor and Marketer agrees to act as an independent contractor to dispense motor fuels at the Fuel Facility in the name and on behalf of BP and furnish services related thereto in accordance with the terms of this Agreement. BP shall supply or arrange for the supply of all motor fuels for sale at the Fuel Facility and shall provide and install all equipment necessary for the dispensing of motor fuels. All inventories of motor fuels shall be owned by BP and shall be dispensed by Marketer on behalf of BP at retail prices established by BP.

**2. TERM.** This Agreement is for a term of four (4) years beginning on ___June 1, 2004___ (the "Term").

Marketer's Signature: _____

**Renewal Term.** If this is a renewal of the Agreement that provides for renewal at Lessee's option, then upon expiration of the Term, Marketer shall have the right to renew this Agreement for one (1) additional successive four (4) year term on BP's then-current forms at the then-current term. At least one hundred eighty (180) days prior to the end of the Term, BP shall give written notice to Marketer of any changes in the Commission and/or other terms of this Agreement for the upcoming Term. Such changes shall be in the sole discretion of BP. Marketer shall then have sixty (60) days to give written notice to BP of Marketer's intent to renew and shall sign all renewal documents.

Marketer's Signature: _____

**Underlying Lease.** If the blank in this Section is filled in, BP's estate in the real estate which includes the Fuel Facility

derives from an underlying lease for which the present term expires on _____September 28, 2009_____ and the term of this Agreement is subject to said underlying lease. BP may have options to renew said underlying lease for certain renewal terms which BP may exercise or may not exercise at its election.

Marketer's Signature: _____

[Marketer signs only if Underlying Lease expiration date is filled in]

**3. RIGHT TO USE FUEL FACILITY.** Marketer acknowledges and understands that its right to use and dispense motor fuels from the Fuel Facility is only for the time period stated in this Agreement and is subject to the provisions of this Agreement. Marketer specifically acknowledges that no representations of any kind have been made to the contrary.

BP does not grant to Marketer an exclusive area or territory under this Agreement. BP shall, at all times and for any reason, maintain its sole and unlimited right to make other provisions for the marketing of its products under any of its Marks (as defined in Section 16 of this Agreement), or under any other trademarks or service marks BP designates, without regard to the location of the Fuel Facility, including, but not limited to, establishing its own directly-operated or commission marketer-operated retail sites, establishing its own directly-supplied reseller/marketer retail sites, and/or approving retail sites to be operated or supplied by other jobbers.

**4. OTHER BUSINESS OPERATIONS.** Only business operations approved in advance in writing by BP may be conducted at the Facility. Business operations subject to BP's approval include, without limitation, the installation of telephones for customer use, vending machines, ice machines and lottery machines. Marketer shall not permit storage or short-term parking of vehicles or trailers at the Facility that is unrelated to the conduct of business at the Facility.

**5. PERSONAL ATTENTION TO OPERATION.** The undersigned individual shall devote his or her personal effort and attention to managing the business at the Fuel Facility and shall be physically present at the Fuel Facility for reasonable periods of time during normal business hours, excepting normal vacations.

**6. PERSONNEL AND TRAINING.** Marketer shall hire and properly train suitable personnel to efficiently and effectively operate the Fuel Facility. All personnel shall be employees of Marketer ("Employees"), and Marketer shall have the sole right and discretion to hire, discipline and discharge the Employees, except as otherwise specified in this Agreement. In the employment of Employees, Marketer shall exercise due care in selecting persons of integrity and reliability.

The Marketer shall cause all Employees to treat customers in a friendly, courteous and respectful manner.

The wages, salaries and fringe benefits paid or to be paid to the Employees shall be determined solely by Marketer. Marketer shall pay its Employees all salaries, wages, fringe benefits and other forms of compensation and reimbursement when due. Marketer shall report and pay when due all payroll and withholding taxes, social security and the like due as a result of such employment.

Marketer shall comply with all policies BP may establish from time to time required for the secure, safe and efficient operation of the Fuel Facility.

**7. COMPENSATION.** The sole compensation to Marketer under this Agreement shall be the following Commission Fee which is based on the volume of motor fuels sold at the Fuel Facility, payable according to BP policies and procedures as may be amended from time to time:

    0 cents per gallon on all self-serve grades

    13.2 cents per gallon on all full-serve grades, plus a bonus of 0 cents per gallon

    0 cents per gallon on diesel fuel

The full serve bonus shall be reviewed annually; and BP reserves the right, in its sole discretion, to eliminate or change the full serve bonus at each anniversary date of the execution of this Agreement. BP may from time to time offer additional commission on all grades as a promotion which BP can implement and withdraw in its discretion.

**8. SECURITY DEPOSIT.** Upon execution of this Agreement, Marketer shall post a security deposit in the amount of

$ _____29,000.00_____ as security for motor fuels stored in the ground and the proceeds from the sale of motor fuels.

BP shall have the right to increase or decrease the security deposit upon thirty (30) days written notice in accordance with BP policy in consequence of Marketer's credit history, changing values of inventory or other business considerations. It is understood and agreed that BP shall not be required to pay to Marketer interest on the security deposit, except as otherwise required by law. Upon expiration or termination of this Agreement, BP shall retain the security deposit for a period of one-hundred eighty (180) days to be used to satisfy any outstanding balances or charges incurred by or against Marketer prior to expiration or termination of this Agreement, but not received until after that time. The security deposit shall be returned less any funds due to BP from Marketer at the time of such release.

**9.  CASH.** Marketer shall permit no more than $200 in cash from the sale of motor fuels to be kept in the cash drawer at any one time at the Facility and shall follow the cash procedures and security guidelines set by BP from time to time including, but not limited to, maintaining a locked door to any secured area.

**10. ACCOUNTING.** Marketer shall establish an account with a financial institution on terms acceptable to BP that provides Electronic Funds Transfer ("EFT") services and to authorize BP to initiate certain transfers of funds between the account and designated accounts of BP for payment of any and all amounts due BP under this or any other agreement with Marketer. Marketer shall provide BP with the information and authorization necessary to debit and credit Marketer's account via EFT transactions. Marketer shall provide the necessary authorization and assistance to implement such additional EFTs promptly upon the request of BP. Marketer shall promptly pay BP in the manner and at the times established by BP for all gross receipts from the sale of motor fuels. All sales proceeds and accounts receivable arising from the sale of all motor fuels shall at all times be and remain the property of BP. BP shall be responsible for credit card fees for the sale of motor fuels. Marketer shall be responsible for all other credit card fees for sales at the Facility.

    A.  Marketer shall properly prepare and submit all reports and statements relating to the operation of the Fuel Facility now or hereafter required by BP. To aid both parties in this accounts monitoring activity, BP may, at its option and at its expense, furnish a point-of-sale device and related equipment ("POS Device") and/or other equipment for the Facility. BP shall pay seventy percent (70%) and Marketer shall pay thirty percent (30%) of the costs of installation of the POS Device and related equipment. BP assumes costs of maintenance and Marketer assumes costs of operation and normal wear and tear of such POS Device, including supplies such as paper, ink and the like. "Normal Wear and Tear" means wear and tear resulting from use of the POS Device for the purpose and in the manner for which it was intended. Normal Wear and Tear shall not include damage resulting from willful abuse or negligence or accidental damage such as, but not limited to, spillage of liquids into or onto the POS Device; clear damage resulting from customer disassembly, attempted repair and missing parts; broken case parts from dropping printer and carving; coffee, soda, juice, water and other liquid spills inside printer that cause damage; foreign debris or matter inside printer that normally does not belong at the system terminal or should be kept clear of or cleaned from the printer, provided such cleaning does not require any disassembly of the printer and can easily be done by persons untrained in printer maintenance; stickers, personal artwork/doodling and carving on case parts; cuts, splices and attempted repair that damage interface and/or power connectors; gear and ribbon drive damage resulting from the use of third party (clone) ribbon cartridges; and acts of nature or war, lightening, floods, fires, other extreme physical damage.

    B.  In the event that Marketer fails to pay any moneys belonging to or owing to BP, BP may deduct such moneys from any compensation due or that may become due to Marketer or from the security deposit. This right shall be exercised at BP's option and shall be in addition to BP's other rights and remedies.

    C.  BP shall have the right to impose a service and late payment charge for each check and/or other payment which is dishonored for insufficient or uncollected funds, whether or not subsequently paid by Marketer. BP shall also charge Marketer the sum of $50 for every check, draft and/or payment returned by Marketer's bank for non sufficient funds ("NSF").

    D.  If Marketer presents BP with NSF checks, drafts and/or other payments on one (1) or more occasions within any twelve (12) month period during the term of this Agreement, BP may terminate this Agreement.

    E.  Marketer shall install and maintain a computer at the Fuel Facility and have Internet Access.

    F.  Marketer must notify BP in writing of any questions or disputes regarding any charges or other items included on any invoice or statement issued to Marketer by BP within sixty (60) days after such invoice or statement is received by Marketer. Unless Marketer provides BP with such written notification, the invoice or statement shall be conclusively presumed to be accurate as of the sixty-first (61st) day following its receipt by Marketer.

**11. AUDITING.** BP shall have the right at all times to inspect motor fuels, books and records in the possession or control of Marketer to determine compliance with this Agreement and all related agreements.

**11. AUDITING.** BP shall have the right at all times to inspect motor fuels, books and records in the possession or control of Marketer to determine compliance with this Agreement and all related agreements.

**12. OPERATING STANDARDS AND PROCEDURES.**

A. Marketer shall perform motor fuel street price surveys, record and transmit the survey information and make sign and system price changes in the manner and at the times established by BP from time to time. Marketer agrees and understands that timely and accurate price changes and submission of survey information is an important part of this Agreement. Marketer shall be responsible for any loss to BP caused by Marketer's failure to properly or timely survey, record or transmit price information or to properly or timely make sign or system price changes.

B. Marketer agrees to maintain the retail image standards and standards of appearance and cleanliness at the Fuel Facility as specified by BP from time to time and to follow all instructions of BP representatives relating thereto. This includes, but is not limited to, daily cleaning of the Fuel Facility including the fuel dispensing equipment; daily removal of debris from driveways; prompt trash removal; snow removal; landscaping care; routine cleaning of light fixtures; and all other routine maintenance as designated by BP. No signs or notices shall be displayed at the Fuel Facility unless they are authorized in advance by BP. All Employees of Marketer shall at all times be neat and clean and wear uniforms approved by BP. Marketer shall be solely responsible for all repairs resulting from vandalism that occurs at the Leased Business, including the cost of such repairs.

C. Marketer shall be responsible for the proper execution of gasoline promotion activities directed by BP from time to time including the proper display of point-of-purchase ("P.O.P.") materials. BP shall supply Marketer with a kit containing a minimum quantity of liquidators prescribed by BP. BP shall bill Marketer for an amount equal to the cost of the liquidators supplied by BP multiplied by the number of liquidators supplied.

D. In its performance of the duties required under this Agreement, Marketer shall follow and shall cause all of its Employees to follow BP's policies and operating standards and procedures as may be amended by BP from time to time, including but not limited to, those regarding delivery, receipt and sale of motor fuels; inventory measurements; security and safety; acceptance of credit cards; repair and maintenance of equipment; customer service and the proper handling of customer complaints. Marketer and its employees shall attend conferences and training programs as required by BP for which BP may elect to charge a fee.

E. Marketer shall comply with and be bound by the audit and monitoring procedures which BP may from time to time create and modify to monitor, implement and enforce (a) Marketer's obligations under this Agreement, and (b) BP's standards and policies. Marketer shall conduct all business operations at the Fuel Facility in a manner which meets BP's operating standards, policies and procedures and reflects favorably upon BP.

F. 1) BP may from time to time endorse and sponsor specific proprietary and third party payment methods including certain credit cards, charge cards, fleet cards, debit cards, pre-paid cards and the like (collectively "Payment Methods") for use at facilities selling Amoco-branded and BP-branded products. BP shall not be obligated to sponsor or participate in any specific payment methods program, or may withdraw its sponsorship of, or participation in, any such program at any time, or may condition any sponsorship or participation upon payment of service and equipment fees by Marketer. If BP does sponsor a payment methods program, ("Payment Methods Program"), Marketer agrees that BP's proprietary Payment Methods and all BP-approved third party Payment Methods specified by BP shall be accepted at each payment point (including card-readers-in-dispensers) at the Fuel Facility. Marketer shall strictly comply with the operating rules, terms and conditions of any Payment Methods Program that BP may sponsor and distribute, through any manuals, bulletins, or other forms of written or electronic communications, as issued and as amended from time to time. BP has the right to charge back to Marketer sales transactions amounts made by Marketer's customers up to and including six (6) months from the date of transaction.

2) The Fuel Facility shall be equipped with electronic point-of-sale ("EPOS") equipment approved by BP for processing transactions on BP's Payment Methods network. All BP approved EPOS equipment shall, at all times, be connected to BP's Payment Methods network and shall be operated using BP's most current Payment Methods software. Marketer shall install BP's most current software at the request of BP. Unless otherwise specified, no right, title, or ownership interest in any software shall be transferred to Marketer. Marketer acknowledges that the software and the specifications are proprietary products of BP or its vendors. Under no circumstances shall Marketer reverse engineer, decompile, disassemble, or otherwise attempt to derive the source code for the software or alter its intended functionality. Marketer shall pay any and all additional or new costs or fees associated with the operation of the EPOS equipment, including, but not limited to, costs associated with EPOS software upgrades, access fees and telecommunications costs. BP reserves the right to change or upgrade the BP approved EPOS equipment by giving Marketer ninety (90) days written notice of such change or upgrade. BP reserves the right to change the fee for the leasing of BP approved EPOS equipment by giving Marketer thirty (30) days written notice of such fee change.

G. BP may charge Marketer $ _____ per month for maintenance for each printer at the Fuel Facility leased to the Marketer by BP. BP may raise this fee upon thirty (30) days prior written notice. The fees shall be billed directly to the Marketer's account.

H. Marketer shall participate in any BP sponsored mystery shopper program. Marketer must score no less than the established retail target as specified by the then current requirements of the mystery shopper program. Marketer shall promptly correct any operations which fail to meet BP's requirements. Failure to do so may result in termination of this Agreement.

**13. HOURS OF OPERATION.** Except as otherwise required by law, Marketer shall keep the Fuel Facility properly lighted and open for self-serve motor fuel sales seven (7) days a week, twenty-four (24) hours per day, unless otherwise approved in writing by the Regional Vice President and noted below. In seeking such approval, Marketer must provide to BP, in writing for the Regional Vice President's review and approval, the business reasons why the Fuel Facility cannot be open for self-serve motor fuel sales seven (7) days a week, twenty-four (24) hours a day.

☒ **7 Days per Week /24 Hours per Day**

☐ **Same Hours of Operation All 7 Days per Week**
   From: _____ A.M.   _____ P.M.

☐ **Other hours of operation** (complete the section below)

| Day | Minimum Open Hours | | To: | |
|-----|------|------|-----|------|
| | From | | | |
| Monday | _____ | A.M. | _____ | P.M. |
| Tuesday | _____ | A.M. | _____ | P.M. |
| Wednesday | _____ | A.M. | _____ | P.M. |
| Thursday | _____ | A.M. | _____ | P.M. |
| Friday | _____ | A.M. | _____ | P.M. |
| Saturday | _____ | A.M. | _____ | P.M. |
| Sunday | _____ | A.M. | _____ | P.M. |

In addition, Marketer can provide full-serve gasoline service between the hours of _____ A.M. and _____ P.M. at fueling positions designated by BP from time to time. During hours when said fueling positions are not being used for full-serve sales, they shall be used for self-serve sales.

**14. CUSTOMER ACCESS.** Marketer shall ensure that driveways are not blocked and that customers have convenient access to fuel dispensing and sales areas, rest rooms, air hoses, vacuum equipment, car wash and other approved business operations, if any.

**15. LICENSES AND PERMITS.** Marketer shall procure and maintain all licenses and permits necessary for the operation of the Fuel Facility, and BP shall reimburse Marketer for all fuel-related licenses. If requested by BP, Marketer shall assist BP in procuring and maintaining said licenses and permits. Marketer shall comply with the terms of all Fuel Facility licenses and permits. In the event such licenses and permits are revoked, this Agreement shall terminate.

**16. TRADE IDENTITIES.**

A. Marketer is licensed to use on a limited and nonexclusive basis the trademarks, trade names, service marks, logos, brand names, trade dress, design schemes, insignia, color schemes and the like ("Trade Identities") designated by BP from time to time only in connection with Marketer's business operations on the Fuel Facility during the term of this Agreement. BP's Trade Identities include those in use at the time this Agreement is entered into by the Parties, as well as those Trade Identities that BP may subsequently adopt or are the subject of a license to use as may be acquired by BP. Marketer's use of the Trade Identities shall be governed by BP's guidelines, standards, policies and procedures as may be amended by BP from time to time. Marketer understands and agrees that the Trade Identities are trademarks, trade names and service marks exclusively owned by BP or subject to a license to use as may be acquired by BP. Except as expressly provided in this Agreement, Marketer shall not acquire any right or license in or to said Trade Identities, and Marketer agrees that the Trade Identities shall be displayed in accordance with BP's standards and policies. Upon termination of this Agreement for any reason whatsoever, Marketer shall return all signs, labels and other items containing the Trade Identities to BP.

B.  Prior to establishing a Website in connection with Marketer's operation of the Fuel Facility, Marketer must submit to BP a sample of the Website information in the form and manner prescribed by BP from time to time. "Website" means an interactive electronic document contained in a network of computer linked by communications software. Marketer shall not establish a Website which has not been approved in writing by BP. Marketer must follow BP's standards and specifications for Websites as prescribed by BP from time to time in the Operations Manual.  If Marketer alters its Website previously approved by BP, it must submit to BP a sample of such alterations and receive BP's approval prior to implementing such alterations to the Website.

**17. COMPLIANCE WITH LAW.**  Marketer shall comply with all applicable laws and regulations with regard to the operation of the Fuel Facility, including, but not limited to, all applicable employment, occupational, health, safety and environmental laws and regulations. Marketer will comply with all laws regarding youth access to tobacco. Violation(s) of such laws can constitute grounds for termination or non-renewal of this Agreement.

**18. LIABILITY.**  Marketer shall be liable for any loss, damage, injury or other casualty to the person or property of anyone, including Marketer, caused in whole or in part by any failure to comply with any term or provision of this Agreement or any law or regulation or by any negligence or fault of Marketer, its agents or employees in any way relating to the use, possession, or operation of the Fuel Facility.  Marketer, for itself, its agents, employees, heirs, personal representatives, successors and permitted assigns specifically agrees to indemnify and hold BP, its parent, affiliates and each of their respective agents, employees, officers, directors, successors and assigns harmless from and against all claims, demands, liabilities, suits or actions (including all reasonable expenses and attorneys' fees, incurred by or imposed on BP in connection therewith) for any such loss, damage, injury or other casualty.  BP does not waive and Marketer is not released from any liability and/or obligation Marketer has or may have to BP or third parties under any prior agreement or lease.

Marketer shall be responsible for, and shall not be reimbursed by BP for, any and all uncollected amounts or shortages at or pertaining to a Fuel Facility including, but not limited to, uncollected amounts or shortages due to: customers who drive-off from a Fuel Facility without paying ("Drive-offs"); customers who do not honor payments made by check and who fail to pay due to NSFs; credit card fraud; all other incidents of theft or fraud; robbery; credit card misuse; and all other crimes or wrongful acts or omissions.  In addition, Marketer shall be responsible for charge backs assessed by BP for all incidents of credit card fraud or credit card misuse.  Marketer shall be responsible for any losses due to robberies, unless Marketer followed all applicable regulations, instructions and procedures established by BP and otherwise had no fault; BP's loss is limited to $200, regardless of the amount of any such loss.

Marketer shall not be responsible for motor fuel inventory loss, tank leakage, fuel spills, gasoline fumes or under any hazardous waste statute, toxic waste cleanup statute or similar law or regulation, provided that Marketer has followed BP's instructions and procedures and performed all of its obligations hereunder regarding the detection and reporting of tank leakage and so long as the loss, leakage, spill or fumes are not caused in whole or in part by the negligence or fault of Marketer or its agents or Employees.

In no event shall either party be liable to the other for any consequential, incidental, punitive or exemplary losses or damages suffered by the other party.  Any action by either party under this Agreement must be brought within one (1) year after the cause of action arose.  Each party irrevocably waives trial by jury in any action, proceeding or counterclaim, whether at law or in equity, brought by either party.

**19. INVENTORY MEASUREMENTS.**  In order to assist BP in detecting tank leakage, other causes of motor fuel shortage, and in order to assist Marketer and/or BP in complying with any legal requirements, Marketer, on a daily basis and whenever specifically requested by BP, shall complete daily inventory reconciliations and take physical inventory measurements of the amount of motor fuels in storage at the Fuel Facility and check for the presence of water and shall report such measurements to BP in the manner and at the times established by BP.  Marketer shall report any detected or suspected shortage or tank leakage of motor fuel immediately to BP.

**20. MAINTENANCE AND REPAIR.**  BP shall be responsible for all repairs and maintenance required at the Fuel Facility, except for maintenance as set forth in Exhibit 1 to this Agreement.  Marketer shall be solely responsible for all repairs resulting from vandalism that occurs at the Leased Business, including the cost of such repairs.  Marketer shall be diligent in monitoring the condition of the Fuel Facility and its need for maintenance and repairs.  Marketer agrees to give prompt notice to BP when repair or maintenance is required by BP and shall follow-up with BP as necessary.  Marketer shall be responsible for all maintenance set forth in Exhibit 1 to this Agreement and shall perform said maintenance in a timely manner and as set forth in policies and procedures which may be issued by BP from time to time.  If Marketer fails to perform Marketer's maintenance and/or repair obligations as set forth in this Agreement and/or Exhibit 1 in a timely manner, BP shall have the right, in its discretion, to perform such maintenance and/or repairs and charge Marketer for the costs thereof.

BP shall not be responsible for maintenance and repairs necessitated by Marketer's or its agent's or employee's negligence or fault.  Marketer shall exercise reasonable care in the operation and maintenance of the Fuel Facility and equipment owned by BP and shall be liable for any loss or damage for failure to do so.

**21. TAXES.** BP shall pay all real estate taxes relating to the Facility. BP shall pay all taxes which are imposed upon BP's business operations and any property, equipment and fixtures belonging to BP at the Fuel Facility. Marketer shall pay all taxes which are imposed upon Marketer's business operations at the Fuel Facility, including but not limited to any income derived therefrom.

**22. UTILITIES.** Marketer shall pay all bills for all utilities relating to the Facility including, but not limited to, electricity, heating, air conditioning, telephone service, waste disposal, trash pick-up, sewer and water.

**23. TERMINATION AND NONRENEWAL.**

A. If any of the following events occur, BP may terminate or nonrenew this Agreement upon ninety (90) days written notice or such shorter notice as is reasonable under the circumstances or otherwise required by state law:

   1) Breach of any provision of this Agreement or the Lease.

   2) Failure to maintain or follow any of the operating standards or procedures as provided in this Agreement or any operational standard or procedure issued by BP from time to time.

   3) Failure to properly or accurately perform price surveys or record or transmit prices or make sign or system price changes.

   4) Adoption of any law or regulation prohibiting the operation of motor fuel sales facilities by independent contractors such as Marketer.

   5) Death of Marketer, except that Marketer may designate in writing to BP a successor who must at the time of Marketer's death meet BP's selection criteria for Commission Marketers.

   6) A continuing severe physical or mental disability or alcohol or drug abuse of Marketer of at least three (3) months duration (or such shorter duration which under the facts and circumstances constitutes an unreasonable period of time) which renders Marketer unable to provide for the continued proper operation of the Fuel Facility.

   7) Failure of Marketer to devote Marketer's personal attention at the Fuel Facility, it being the essence of the parties' relationship that Marketer's personal, physical presence be at the Fuel Facility as provided in this Agreement.

   8) The incurring of unauthorized indebtedness on BP's behalf.

   9) Condemnation or other taking, in whole or in part, preventing or materially affecting the use and/or operation of the Fuel Facility.

   10) Destruction of all or a substantial part of the Fuel Facility.

   11) Loss of BP's right to possess or operate the Fuel Facility.

   12) Failure to comply with all applicable laws and regulations.

   13) Insolvency of Marketer or the filing of a voluntary petition in bankruptcy by, or an involuntary petition in bankruptcy against Marketer, judicial determination that Marketer is bankrupt or insolvent or any other reasonably convincing evidence of financial distress of Marketer, such as, without limitation, appointment of a receiver for Marketer, assignment by Marketer for the benefit of creditors and the like.

   14) Decision by BP to sell the Facility for a use other than the sale of BP-branded or Amoco-branded petroleum products. In such event BP shall make a bona fide sale offer or give a right of first refusal to Marketer.

   15) Decision by BP to withdraw from Commission Marketer operations in the geographic area of the Facility. In the event BP specifically designates its decision to withdraw from Commission Marketer operations as the grounds for termination and BP has not also decided to withdraw from marketing through lessee-dealers in the geographic area of the Facility, BP shall offer Marketer the option to become a lessee-dealer on BP's then current forms.

B.  If any of the following events shall occur, BP may terminate this Agreement immediately upon written notice:

  1)  Failure to properly deposit or account to BP for all gross receipts from the sale of motor fuels in a timely manner.

  2)  Conviction of Marketer of any felony.

  3)  Fraud or criminal misconduct by the Marketer or Marketer's employees relevant to the operation of the Facility.

  4)  Failure to comply with environmental and/or safety standards or procedures established by governmental authorities.

  5)  Failure to operate the Fuel Facility for seven (7) consecutive days or such lesser period of time as may be reasonable under the circumstances.

  6)  Failure to comply with standards or specifications more than twice in any twelve (12) month period, regardless of whether such defaults are cured.

  7)  Giving of one (1) or more insufficient funds checks within any twelve (12) month period.

C.  BP shall not be obligated to continue the sale of its motor fuels from the Fuel Facility covered by this Agreement if it should make a determination to withdraw from marketing of motor fuels under the BP trademark or trade name at retail outlets in the geographic area of the Facility. In such event, BP may terminate this Agreement upon one hundred eighty (180) days notice.

D.  BP shall not be obligated to continue the sale of motor fuels from the Fuel Facility if Marketer fails to pay BP for amounts collected from the sale of motor fuels, whether through NSF or otherwise.

E.  This Agreement shall terminate upon the termination, nonrenewal or expiration, for any reason, of the Lease. Marketer acknowledges and understands that upon the termination, nonrenewal or expiration of this Agreement and/or the Lease, BP may discontinue operations at the Facility or may continue in possession of the Facility and operate it with its own employees or establish operations by a contractor, marketer and/or jobber and may, without limitation, transfer, operate or use the Facility in any manner for any purpose.

F.  Marketer agrees to vacate the premises on the effective date of the termination or expiration of this Agreement or the Lease, remove any inventory, equipment, machinery, tools, goods, products and supplies belonging to Marketer, subject to the provisions of the Agreement and the Lease, and surrender the premises to BP in as good condition as when received, normal wear and tear excepted. If removal of Marketer's property causes any damage, BP may repair such damage at Marketer's expense. In the event Marketer fails to remove any such items owned by it within ten (10) days after the effective date of the termination or expiration of this Agreement or the Lease, title thereto shall pass to BP without notice and without cost or charge and Marketer waives any claims for such items.

## 24. INSURANCE.

A.  Without limiting Marketer's obligations, Marketer agrees to purchase and maintain at all times, at Marketer's expense and in compliance with any requirements of applicable law, insurance as outlined in this Section. This insurance must be satisfactory in form and in substance to BP and must be of at least the following minimum kinds and limits:

  1)  Commercial general liability insurance, in an amount of at least $1,000,000 per occurrence, covering Marketer's liability for business, operations, use and occupancy of the Fuel Facility.

  2)  Automobile liability insurance in an amount not less than $1,000,000 combined single limit for any auto used in the Marketer's operations.

  3)  Worker's compensation insurance as required by statute, unless Marketer qualifies and remains qualified as a self–insurer under applicable federal and state laws;

  4)  Employers' liability insurance with limits of not less than $500,000 for each accident, disease – policy limit, and disease – each employee;

  5)  If alcoholic beverages shall be sold at Leased Premises, liquor liability insured in an amount not less than $1,000,000 per occurrence.

B.   The insurance policies required by Section 24 of this Agreement hereof shall be written by companies satisfactory to BP, and shall be primary and non-contributory to any coverage carried by BP. Insurance policies satisfying the requirements of Section 24.A. shall include BP, its parents, subsidiaries and affiliated companies as additional insureds.

C.   Marketer agrees to increase the amount of any insurance described herein promptly upon execution of this Agreement or upon receiving written notice from BP to do so.  In addition, BP reserves the right to require additional types of coverage such as, without limitation, environmental impairment liability insurance to satisfy governmental requirements for financial responsibility. Marketer agrees to obtain such additional insurance promptly upon receiving written notice from BP to do so.

D.   Marketer agrees to provide BP with a certificate of insurance evidencing coverage promptly upon request by BP.  If Marketer qualifies as a self insurer for purposes of Section 24.A.3 above, Marketer shall furnish BP with evidence of such qualification and any changes thereto, in lieu of the insurance certificate.

E.   Marketer shall not materially change, amend, or cancel any of the insurance policies that Marketer is required to obtain under this Agreement, without first providing BP with thirty (30) days written notice of the intent to do so, and obtaining BP's prior written consent to such change, amendment or cancellation.

F.   The existence or non-existence of any insurance shall not limit Marketer's liability for indemnity and other obligations contained in this Agreement.

**25. NOTICE.**  Any notice provided for herein shall be considered properly given if:  (a) mailed by certified mail return receipt requested or private express mail service (such as Federal Express) to the other party at the address listed in this Agreement or at such other address as such party may from time to time designate by written notice to the other party; (b) hand delivered to the Marketer or the Facility; or (c) sent by facsimile provided that a confirmation copy is sent by private express mail service on the same day.  The effective date of any notice shall be the first of (a) the date the notice is mailed by certified mail or private express mail service; (b) the date of delivery of the notice to the Marketer or the Facility; or (c) the time the notice is sent by facsimile.

**26. RELATIONSHIP OF PARTIES.**  This Agreement creates an independent contractor relationship and Marketer shall have no authority or right to incur indebtedness or to bind or commit BP. This Agreement is not intended to, nor does it create a joint venture, partnership or employer/employee relationship between the parties.

Marketer acknowledges and understands that in the absence of the personal commitment of the undersigned individual to the operation of the Fuel Facility for which Marketers qualifications and abilities are essential, BP would not have entered into this Agreement.

MARKETER ACKNOWLEDGES AND AGREES THAT THIS AGREEMENT DOES NOT CREATE, EXTEND OR RENEW A FRANCHISE UNDER ANY LOCAL, STATE OR FEDERAL LAW, INCLUDING BUT NOT LIMITED TO THE FEDERAL PETROLEUM MARKETING PRACTICES ACT.

Marketer agrees that it shall have no right, privilege or interest in or to the Fuel Facility or the property on which the Fuel Facility is located or in the business or goodwill of BP by virtue of this Agreement.  BP, its agents and employees shall have unrestricted access to the Facility at all times.  BP shall determine in its sole discretion the types of improvements and equipment to be located at the Fuel Facility and the number and the location of pay points. BP may make changes or additions to the Fuel Facility without obligation or liability to Marketer.  BP retains the right at all times to market motor fuels, merchandise and services in the area of the Facility at other locations, including but not limited to establishing its own employee operated retail facilities, marketer operated facilities, contractor operated facilities, other Commission Marketer facilities and/or jobber supplied retail facilities.

**27. ASSIGNMENT, FIRST REFUSAL.**

A.   Marketer shall have the right to assign this Agreement after first obtaining the written consent of BP, which consent shall not be unreasonably withheld.  No assignment approved and permitted by BP shall in any manner limit or release Marketer from its obligations under this Agreement.

B.   BP shall have a right of first refusal to purchase or otherwise acquire Marketer's interest in this Agreement and/or Marketer's business as related to this Agreement on the same terms and conditions as set forth in any contract entered into by Marketer in any bona fide arms-length transaction.  Marketer agrees to submit to BP legible, fully executed copies of all contracts, agreements, side letters and undertakings related to any such transaction.

Marketer further agrees to submit to BP such additional information, facts and data as BP deems necessary to assist BP in confirming the bona fide nature of the transaction and to provide BP with a basis for granting any consent to assignment or exercising any right of refusal as provided for herein. BP, at its election, may exercise its right of first refusal in accordance with the provisions of this Section or may assign its right of first refusal and/or other rights hereunder to any other person or legal entity. BP has the option to substitute cash for any non-cash consideration offered by a prospective purchaser. BP shall be entitled to customary warranties and representations from Marketer. BP or its assignee shall have thirty (30) business days (i.e., Monday through Friday, excluding all state and federal holidays) from the receipt of fully executed copies of all contracts and related agreements between Marketer and the proposed purchaser and all additional information requested by BP.

C.  If BP does not elect to exercise its right of first refusal within the time period provided herein, Marketer may assign this Agreement if Marketer obtains BP's prior written consent, which shall not be unreasonably withheld. BP may condition its consent to assignment upon (1) the satisfaction by the proposed assignee of all of BP's then current requirements for the qualification of new marketers including, but not limited to, the assignee's successful completion of BP's marketer training program; (2) the agreement of the proposed assignee to enter into an BP Lease Agreement regarding the Leased Premises; (3) payment of the assignment fee charged by BP at the time of transfer; and (4) simultaneously therewith the execution by Marketer of an assignment of this Agreement and associated agreements. In addition, BP may, at its election, condition its consent upon the satisfaction by Marketer of all indebtedness owed by Marketer to BP upon the express agreement of Marketer to remain liable for the observance by the proposed assignee of all terms and conditions hereof. If BP gives its consent to an assignment by Marketer, or if BP agrees to enter into a new Commission Marketer Lease with Marketer's assignee, Marketer shall pay to BP before the Marketer change, BP's administrative cost to effect the Marketer change. This cost is $10,000.00. No administrative fee is due if this Agreement is transferred pursuant to Section 28 if BP assigns its rights to a third party, or if BP exercises its right of first refusal pursuant to Section 27.B.

D.  Marketer is the sole owner of the business operations regarding the Fuel Facility and shall not sell, assign or otherwise permit the change of any legal or beneficial interest in said business, including, but not limited to, any sale, conveyance, transfer or assignment of any such interest to a corporation, limited liability company or partnership owned or controlled by Marketer, without the express written consent of BP.

E.  Nothing in the above shall constitute a limitation in any manner on BP's right to reasonably withhold its consent to any proposed assignment by Marketer for reasons not mentioned herein or to impose other qualifications to the giving of such consent.

F.  It is expressly understood and agreed that BP shall have the right to sell the Fuel Facility and/or sell or assign this Agreement to a third party, including but not limited to a branded Jobber.

**28. SUCCESSOR IN INTEREST DESIGNATION.** Marketer designates the following as a Successor in Interest to any relationship between Marketer and BP resulting from this Agreement:

Primary Successor in Interest

Name: _ICYAS    BAGA_

Address: _316    8th    street.    FAIRWAY_

Birth Date: _03-01-1966_

Relationship to Dealer: _Brother._

Alternate Successor in Interest

Name: _Rita    BAGA_

Address: _316.    8th    St.    FAIRWAY_

Birth Date: _____

Relationship to Dealer: _Sister._

Marketer acknowledges that designated successors in interest shall be considered as assignees franchises provided they meet BP's then current standards and qualifications for Marketer candidates. BP reserves the right to request additional documentation to verify designees.

**29. ENTIRE AGREEMENT.** This Agreement and the Lease cancel and supersede all prior written and unwritten agreements and understanding between the parties pertaining to the Facility. No obligation, agreement or understanding shall be implied from any course of dealing or from any of the terms and provisions of the Agreement or the Lease, all obligations and understandings with respect to the subject matter hereof being expressly set forth in this Agreement and the Lease. No representations or statements other than those expressly set forth herein have been relied upon by the parties in entering into this Agreement. No modification or amendment of the terms of this Agreement shall be effective unless reduced to writing and signed by an authorized representative of each party.

**30. WAIVER.** No waiver of the breach of any terms or provisions of this Agreement shall be construed to be a waiver of any preceding or succeeding breach of the same or any other terms or provisions. The rights and remedies hereunder shall be without prejudice, and the exercise or enforcement of any one or more of them shall not preclude the exercise or enforcement of any other right or remedy.

**31. CONFIDENTIALITY.** The specific provisions of the business relationship between the parties and this Agreement and BP's marketing plans and strategies are confidential and shall not be disclosed except to Marketer's attorneys and financial advisors and then only on the condition that they also be bound by this confidentiality provision. Upon the termination of this Agreement Marketer shall return all BP policies and procedures and any copies thereof.

**32. FORCE MAJEURE.** Neither party shall be liable for delays or nonperformance caused by an event which cannot be reasonably foreseen or prevented, including without limitation, unavailability, failure or delay of transportation, labor difficulties, fire, riots, war conditions in any country, compliance with any governmental order, regulation, recommendation, request or allocation program (whether voluntary or involuntary), material or labor restrictions by any governmental authority or any Act of God affecting directly or indirectly either party's ability to perform hereunder. Settlement of strikes shall be at the discretion of the party so affected.

BP shall be excused from delay or nonperformance if BP is unable to meet the demand for motor fuels at BP's normal and usual source points for supplying the Fuel Facility (regardless of whether or not BP may have diverted certain supplies from such source points in order to alleviate shortages at other distribution points), or in the event of failure or delay in delivery due to exhaustion, reduction or unavailability of motor fuels or component necessary in the manufacture or production thereof.

In the event of any of the contingencies or conditions referred to above, BP shall have the right to curtail deliveries or allocate its supply of motor fuels and/or inventory in any manner which in its sole discretion is fair and reasonable in the circumstances and Marketer shall not hold BP responsible in any manner for any losses or damages that may accrue as a result thereof.

**33. SEVERABILITY.** If, for any reason any portion of this Agreement is held to be invalid, contrary to, or in conflict with any applicable present or future law, the remaining portions of this Agreement, to the extent practicable, shall remain in effect to the extent permissible under such law. If any applicable law requires a greater prior notice of termination or other action than is required hereunder or the taking of some other action not required hereunder, or if under any applicable law any provision of this Agreement or any specification, standard or operating procedure is invalid or unenforceable, such notice and/or other action required by such law shall be substituted for the comparable provisions hereof.

Witness:

BP Products North America Inc.

By: _____
    Michael Mulhern

Its:    **Regional Account Executive**

Date: 3/24/04

Witness:

Marketer:

By: _____
    Hagop Baga

Date: 03/24/04



**EXHIBIT 1**

**MAINTENANCE**

**COMMISSION MARKETER AGREEMENT**
(4-2003)

| ENVIRONMENTAL COMPLIANCE EQUIPMENT | Marketer | | BP | |
|---|---|---|---|---|
| | Pays | Dispatches | Pays | Dispatches |
| Observation wells - maintenance & repair | | | X | X |
| Monitoring wells - inspection | | | X | X |
| Monitoring well log/file at station | X | X | | |
| Cathodic protection test | | | X | X |
| Cathodic protection test log/file at station | X | X | | |
| Tank, line, Stage II test | | | X | X |
| Tank, line, Stage II test log/file at station | X | X | | |
| Leak detector test | | | X | X |
| Leak detector test log/file at station | X | X | | |
| 36-hour waste oil U/G tank test (if required) | X | X | | |
| Maintain true inventory reconciliation records (to be retained and made available upon request) | X | X | | |

**EQUIPMENT**

| | Pays | Dispatches | Pays | Dispatches |
|---|---|---|---|---|
| **ARSTA equipment:** | | | | |
| - Earth station | | | X | X |
| - Satellite dish | | | X | X |
| **Dispenser:** | | | | |
| - Hoses | X | X | | |
| - Stage II hoses | X | X | | |
| - Nozzles | X | X | | |
| - Stage II nozzles | X | X | | |
| - Breakaways | X | X | | |
| - Initial ECD compliance expenditures | | | X | X |
| - ECD repair (includes replacement) | | | X | X |
| - Blackmer pump | | | X | X |
| - Valances/doors/endcaps | | | X | X |
| - Dial glass | | | X | X |
| - Displays | | | X | X |

| EQUIPMENT | Marketer | | BP | |
|---|---|---|---|---|
| | Pays | Dispatches | Pays | Dispatches |
| - Lights | | | X | X |
| - CRIND pad/printer | | | X | X |
| - Internal repairs | | | X | X |
| - Calibrations | | | X | X |
| - Total replacement | | | X | X |
| - Decals | | | X | X |
| - Pump filters | | | X | X |
| - Cash acceptors | | | X | X |
| Exhaust fans | X | X | | |
| **Point of sale:** | | | | |
| - Credit card imprinter | | | X | X |
| - Debit equipment | | | X | X |
| - Dispenser interface | | | X | X |
| - ESP receipt printers | X | | | X |
| - POS device | | | X | X |
| - Sales authorization device (Ruby, Data Cards, including modems & pinpads)* | | | X | X |
| Security cash drawer | X | X | | |
| **Tanks & lines:** | | | | |
| - Cover painting | X | X | | |
| - Fill pipes, caps & covers (includes replacement) | | | X | X |
| - Gauge sticks (includes replacement) | X | X | | |
| - Leak detectors & monitoring systems (includes replacement) | | | X | X |
| - Submersible pumps | | | X | X |
| - Sumps, piping, valves & fittings | | | X | X |
| - Tank repair | | | X | X |
| - Tank replacement | | | X | X |
| - Used oil removal | X | X | | |
| - Water removal | | | X | X |
| - Tank cleaning | | | X | X |

| EXTERIOR & YARD FACILITIES | Marketer | | BP | |
|---|---|---|---|---|
| | Pays | Dispatches | Pays | Dispatches |
| **ACM:** | | | | |
| - Lamps | | X | X | |
| - Ballasts | | X | X | |
| - Wiring/breakers | | | X | X |
| - Lighted ACM face (includes replacement) | | | X | X |
| - Lighted ACM frame (includes replacement) | | | X | X |
| - ACM decals | | | X | X |
| **Canopy:** | | | | |
| - Powerwashing | X | X | | |
| - Paint | | | X | X |
| - Poles, paint semi-annually | X | X | | |
| - Mode signs repair | X | X | | |
| - Downspouts/gutters, repair and paint | X | X | | |
| - Non-fuel related POP | X | X | | |
| - Fuel-related POP | | | X | X |
| - Total replacement of canopy | | | X | X |
| Canopy roof*/facia/decking | | | X | X |
| Cleaning of catwalks, drives & islands | X | X | | |
| **Driveway & curbing:** | | | | |
| - Asphalt/Concrete/Curbing repair over $3000 | | | X | X |
| - Asphalt/Concrete/Curbing  repair under $3000 | X | X | | |
| - Pump island repair | | | X | X |
| - Pump island, paint semi-annually | X | X | | |
| - Seal coating | X | X | | |
| - Total asphalt replacement | | | X | X |
| - Total concrete replacement | | | X | X |

| SIGNS | Marketer | | BP | |
|---|---|---|---|---|
| | Pays | Dispatches | Pays | Dispatches |
| Misc. marketer service, merchandise, emblems, etc. | X | X | | |
| Trade Identities: | | | | |
| - Lamps/ballasts | | X | X | |
| - Poles | | | X | X |
| - Base | | | X | X |
| - Paint | | | X | X |
| - Wiring/breakers | | | X | X |
| - Faces (oval/flame) | | | X | X |
| - Frame | | | X | X |
| Price sign: | | | | |
| - Lamps/ballasts | | X | X | |
| - Paint (frame) | | | X | X |
| - Fonts (#s, words) | X | X | | |
| - Font guide track | | | X | X |
| - Add-on signs - repair, not paint | | | X | X |
| - Wiring/breakers | | | X | X |
| - Faces | | | X | X |
| - Frame | | | X | X |

OTHER

| | | | | |
|---|---|---|---|---|
| Gasoline licenses/permits/fees | | | X | X |
| Accidents | | | X | X |
| Vandalism | X | X | | |
| Weather damage | X | | | X |
| Non-gasoline related licenses and permits | X | X | | |
| Simplicity fees | | | X | X |



bp

**EXHIBIT 2**
**COMMISSION MARKETER AGREEMENT**
**STATE ADDENDA**
(4-2003)

<u>ADDITIONAL STATE DISCLOSURES</u> (CHECK APPLICABLE REVISION)

If the Leased Premises is located in any of the following states, then the designated provision in the Agreement shall be amended as follows:

<u>ILLINOIS</u>

The Agreement is amended by an additional "Miscellaneous" Section to the end of original language that appears therein:

1. "Section 4 of the Illinois Franchise Disclosure Act dictates that any provision in a franchise agreement that designates jurisdiction or venue in a forum outside of this state is void concerning any cause of action that otherwise is enforceable in this state, unless a franchise agreement may provide for arbitration in a forum outside of this state."

2. "Any governing law or choice of law clause granting authority to a state other than Illinois effectively negates the Illinois Franchise Disclosure Act. Therefore, the franchise agreement shall be interpreted and construed under the Illinois Franchise Disclosure Act."

3. "Section 41 of the Illinois Franchise Disclosure Act states that any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this Act is void."

Witness:

BP Products North America Inc.

By: _____
Michael Mulhern

Its: _____Regional Account Executive_____

Date: _____3/24/04_____

Witness:

Marketer:

By: _____
Hagop Baba

Date: _____03/24/04_____

S.S. Number

1-00-03396-013

**bp**

**EXHIBIT 3**
**Consent to Assignment**
**of Commission Marketer**
**Agreement**
(4-2003) W

THIS CONSENT TO ASSIGNMENT pertains to the Commission Marketer Agreement dated _3-24-04_,

between BP Products North America Inc. , a Maryland corporation, therein and herein referred to as "BP," and

_Hagop Baga_ therein and herein referred to as "Marketer," relating to the premises situated at

_341 Gorge Road, Cliffside Park NJ 0710_.

Witnesseth, that said Commission Marketer Agreement (hereinafter referred to as the "Agreement") shall be subject to the further terms and conditions, to wit:

Consent is hereby given by BP to Marketer to assign the Agreement to

_Hagop Baga_ , a (an) _____

corporation-partnership-limited liability company (strike whichever is inapplicable) subject to the following terms and conditions:

1. That a true copy of said assignment shall be delivered to BP upon its execution by the parties thereto, but in no event later than five (5) days from the date hereof.

2. That the assignment shall provide that the assignee, in consideration of BP's consent to the assignment, shall promise and agree to be bound by and subject to all the terms and conditions in the Agreement between BP and Marketer identified above and to perform all the duties and covenants of Marketer and to assume all the liabilities of Marketer therein.

3. That Marketer, as principal, officer or employee of said corporation (partnership or limited liability company) shall in good faith during the whole of the term of the instrument, and any renewals or extensions thereof, devote his personal attention, as his major occupation, to managing the business activities referred to in the Lease.

4. That Marketer and all other shareholders (general partners or members) shall personally guarantee payment of the debts, if any, owed to BP by the said assignee incident to the assignee's use of the premises and any dealings with BP relative thereof.

5. That Marketer is the owner of all or a majority of the capital stock of said corporation (or a partner or member having a majority active interest in said partnership or limited liability company) on the date hereof and that Marketer shall not sell, transfer, give or otherwise dispose of any of said capital stock (or his interest in said partnership or limited liability company) during the term of the Agreement or any renewal thereof. Violation of this covenant shall give BP the immediate right to terminate this Consent to Assignment upon five (5) days notice given in accordance with the provisions of the Agreement.

6. That nothing herein contained shall release Marketer from any of Marketer's obligations, covenants or conditions of the Agreement between BP and Marketer identified above.

WITNESS:

_____

_____

BP PRODUCTS NORTH AMERICA INC.

By: _____
Michael Mulhern

Title: **Regional Account Executive**
_____

WITNESS:

MARKETER:

_____
Hagop Baga

_____
Hagop Baga

Accepted and Agreed to on this date, ___03__/_24_/_04_____, by the above-named assignee.

WITNESS:

ASSIGNEE:

By: _____

Title: _Owner._____

S.S. Number
1-00-03396-013


bp

**EXHIBIT 4**
**Owner's Guaranty**
**And Assumption of**
**Obligations**
(4-2003) W

In consideration of, and as an inducement to, the execution of the foregoing Commission Marketer Agreement and Commission Marketer Lease (the "Agreements") by BP PRODUCTS NORTH AMERICA INC. , a Maryland corporation ("BP") each of the undersigned hereby personally and unconditionally (1) guarantees to BP and its successors and assigns, for the

term of these Agreements and thereafter as provided in these Agreements, that _____ **Hagop Baga** _____

("Marketer") shall punctually pay and perform each and every undertaking, agreement and covenant set forth in these Agreements and (2) agrees to be personally bound by, and personally liable for the breach of, each and every provision in these Agreements. Each of the undersigned waives:

1. acceptance and notice of acceptance by BP of the foregoing undertakings;

2. notice of demand for payment of any indebtedness of nonperformance of any obligations hereby guaranteed;

3. protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed;

4. any right he may have to require that an action be brought against Marketer or any other person as a condition of liability;

5. all right to payment or reimbursement from, or subrogation against, the Marketer which he may have arising out of his guaranty of the Marketer's obligations; and

6. any and all other notices and legal or equitable defenses to which he may be entitled.

Each of the undersigned consents and agrees that:

1. his direct and immediate liability under this guaranty shall be joint and several not only with Marketer, but also among Guarantors;

2. he shall render any payment or performance required under the Agreement upon demand if Marketer fails or refuses punctually to do so;

3. such liability shall not be contingent or conditioned upon pursuit by BP of any remedies against Marketer or any other person; and

4. such liability shall not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence which BP may from time to time grant to Marketer or to any other person including, without limitation, the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which shall in any way modify or amend this guaranty, which shall be continuing and irrevocable during the term of the Agreement; and

5. the written acknowledgment of Marketer, accepted in writing by BP, or the judgment of any court or arbitration panel of competent jurisdiction establishing the amount due from Marketer shall be conclusive and binding on the undersigned as Guarantors.

**IN WITNESS WHEREOF**, each of the undersigned has hereunto affixed his signature on the same day and year as these Agreements were executed.

WITNESS                                              GUARANTOR(S)

_Zalia Zala Drbaie_                          _HAGOP BAGA_

_____                          _____

_____                          _____