# Lease Agreement
## (Commission Marketer Leased Business)
### TABLE OF CONTENTS

| SECTION | | PAGE |
|---|---|---|
| 1. | LEASED PREMISES | 1 |
| 2. | BP PARCEL | 1 |
| 3. | TERM | 1 |
| 4. | PURPOSE/USE/RENT | 2 |
| 5. | TENANT'S IMPROVEMENTS AND EQUIPMENT | 3 |
| 6. | TENANT'S USE OF BP PARCEL | 3 |
| 7. | BP'S USE OF LEASED PREMISES | 3 |
| 8. | PRIOR USE/ENTRY FOR REMEDIATION | 4 |
| 9. | OPERATING STANDARDS AND PROCEDURES | 4 |
| 10. | UTILITIES, TAXES, EXPENSES AND FEES | 5 |
| 11. | LAWS AND REGULATIONS | 5 |
| 12. | USE OF LEASED PREMISES | 5 |
| 13. | TRADE IDENTITIES | 5 |
| 14. | LIABILITY, INDEMNITY | 6 |
| 15. | INSURANCE | 6 |
| 16. | MORTGAGE, SUBLETTING | 7 |
| 17. | ASSIGNMENT, FIRST REFUSAL | 7 |
| 18. | RIGHT-OF-ENTRY | 8 |
| 19. | GROUNDS FOR TERMINATION AND NONRENEWAL | 8 |
| 20. | TERMINATION, NONRENEWAL, REMEDIES | 9 |
| 21. | CONDEMNATION | 9 |
| 22. | MATTERS OF RECORD, ZONING | 10 |
| 23. | HOLDOVER | 10 |
| 24. | VACATION OF PREMISES, TENANT'S PROPERTY | 10 |
| 25. | RELATIONSHIP OF THE PARTIES | 10 |
| 26. | AUDITING | 10 |
| 27. | SUCCESSOR IN INTEREST DESIGNATION | 10 |
| 28. | SOFTWARE | 11 |
| 29. | NO WAIVER | 11 |
| 30. | NOTICES | 11 |
| 31. | ENTIRE AGREEMENT | 11 |
| 32. | SEVERABILITY | 11 |
| 33. | FORCE MAJEURE | 11 |

**EXHIBITS**

☒ 1. LEGAL DESCRIPTION OF LEASED PREMISES
☒ 2. DIAGRAM OF LEASED PREMISES (EXCLUDES BP PARCEL)
☒ 3. PURPOSE AND USE OF LEASED PREMISES
☐ 4. COMMISSION MARKETER LEASE STATE ADDENDA
☐ 5. CONSENT TO ASSIGNMENT OF LEASE AGREEMENT

bp

S.S. Number
1-00-03396-013

SVB Number
2219137

**Lease Agreement**
(Commission Marketer
Leased Business)
CMLA (4-2003) W

This Lease ("this Lease") dated  03-24/04  , is between BP Products North America Inc., a Maryland corporation with offices at  28100 Torch Parkway, Suite 300, Warrenville IL 60555 
[Street Address, City, State, Zip Code]

("BP") and  Hagop Baga  with an address of
 341 Gorge Road, Cliffside Park NJ 07010  ("Tenant").
[Street Address, City, State, Zip Code]

IN CONSIDERATION OF the mutual covenants, conditions and promises contained in this Lease Agreement, BP and Tenant hereby agree as follows:

1. **LEASED PREMISES.** BP hereby demises and leases to Tenant the premises situated in the City of  Cliffside Park , County of  Bergen , and State of  New Jersey , more particularly described in Exhibit 1 attached hereto and made a part hereof, together with the buildings, fixtures, equipment, machinery and appliances, if any, located thereon, but expressly excluding the "BP Parcel" as hereinafter described (the "Leased Premises").

2. **BP PARCEL.** The Leased Premises are adjacent to and/or surrounded by a parcel of land used or to be used as a motor fuel sales facility as more particularly shown or described in Exhibit 2 attached hereto and made a part hereof (the "BP Parcel"). Tenant shall operate the motor fuel sales facility ("Fuel Facility") according to the terms of the Commission Marketer Agreement ("CM Agreement").

BP does not grant to Tenant an exclusive area or territory under this Lease. BP shall, at all times and for any reason, maintain its sole and unlimited right to make other provisions for the marketing of its products under any of its Trade Identities (as defined in Section 13 of this Lease), or under any other trademarks or service marks BP designates, without regard to the location of the Leased Premises, including, but not limited to, establishing its own directly-operated or commission marketer-operated retail sites, establishing its own directly-supplied reseller/Tenant retail sites, and/or approving retail sites to be operated or supplied by other jobbers.

3. **TERM.** This Lease is for a term of four (4) years beginning on  June 1, 2004  (the "Term").

Tenant's Signature: _____

**Renewal Term.** If this is a first renewal of the Lease, then upon expiration of the Term, Lessee shall have the right to renew this Lease for one (1) additional successive four (4) year term on BP's then-current forms at the then-current term. At least one hundred eighty (180) days prior to the end of the Term, BP shall give written notice to Tenant of any changes in the Rental and/or other terms of this Lease for the upcoming Term. Such changes shall be in the sole discretion of BP. Tenant shall then have sixty (60) days to give written notice to BP of Tenant's intent to renew and shall sign all renewal documents.

Tenant's Signature: _____

Underlying Lease. If the blank in this section is filled in, BP's estate in the real estate which includes the Leased Premises derives from an underlying lease for which the present term expires on  September 28, 2009  and the term of this Lease is subject to said underlying lease. BP may have options to renew said underlying lease for certain renewal terms which BP may exercise or may not exercise at its election.

Tenant's Signature: _____
[Tenant signs only if Underlying Lease expiration date is filled in]

4. PURPOSE/USE/RENT.

   A. Purpose/Use. Tenant expressly understands that Tenant must use the Leased Premises to operate the business set forth in Exhibit 3 and for the sale of Merchandise, if any, identified on Exhibit 3, attached hereto and made a part hereof.

   B. Rental.

   1) For each calendar month during the term of this Lease, Tenant shall pay to BP rent for the Leased Premises.

   The rent following execution of the this Lease ("Initial Rent") is $  4,911.73  per month. Rent following installation of the new retail image ("Post Image Rent") shall increase in an amount to be determined by BP not to exceed $500.00 per month. BP shall notify Tenant of Post Image Rent in writing thirty (30) days before the new rent shall take effect.

   2) The rent is due and payable in advance on or before the first day of each month. Payment shall be drafted by BP from Tenant's bank account by electronic funds transfer ("EFT") unless BP specifies another means of payment. In the event the rent is not paid when due, it shall be subject to a late payment charge of $100.00 per month. Failure to pay rent per the required terms shall result in the termination of this Lease.

   3) BP has the right to impose a service charge against Tenant for each EFT draft which is returned for nonsufficient funds whether or not subsequently made good by Tenant.

   4) Tenant acknowledges and agrees that BP may, during the term of this Lease, determine that the Leased Premises should be operated to provide different goods and services than currently provided including, but not limited to, gas only, total self-serve and convenience store, car wash operations, and service bays. BP has the right to make these changes at any time during the term of this Lease upon six months written notice to Tenant and to alter the rental fees to be consistent with the arrangement then in effect, or then being placed in effect, for all other tenants engaged in the same type of business in the marketing area in which the Leased Premises is located.

   C. Hours of Operation. Except as otherwise required by law, Tenant shall keep the Leased Premises properly lighted and open for business operation seven (7) days a week, twenty-four (24) hours per day, unless otherwise approved in writing by the Regional Vice President and noted below. In seeking such approval, Tenant must provide to BP, in writing for the Regional Vice President's review and approval, the business reasons why the Leased Premises cannot be open seven (7) days a week, twenty-four (24) hours a day.

   [X] 7 Days per Week /24 Hours per Day
   [ ] Same Hours of Operation All 7 Days per Week
       From: _____ A.M.  To: _____ P.M.

   [ ] Other hours of operation (complete the section below)

   | Day | Minimum Open Hours From: | | To: | |
   |---|---|---|---|---|
   | Monday | _____ | A.M. | _____ | P.M. |
   | Tuesday | _____ | A.M. | _____ | P.M. |
   | Wednesday | _____ | A.M. | _____ | P.M. |
   | Thursday | _____ | A.M. | _____ | P.M. |
   | Friday | _____ | A.M. | _____ | P.M. |
   | Saturday | _____ | A.M. | _____ | P.M. |
   | Sunday | _____ | A.M. | _____ | P.M. |

- D. <u>Finance, Service and Late Payment Charges</u>. BP shall have the right, at its election, to assess finance charges on all amounts not paid by Tenant by the due date. Finance Charges shall be assessed at the monthly periodic rate established by BP. BP shall have the further right to impose a service and late payment charge for each check and/or other payment which is dishonored for insufficient or uncollected funds, whether or not subsequently paid by Tenant. BP shall also charge Tenant the sum of $50 for every check draft and/or other payment that Tenant tenders to BP that is returned by Tenant's bank for non sufficient funds ("NSF"). If Tenant presents BP with NSF checks and/or other payment on one (1) or more occasions within any twelve (12) month period during the term of this Lease, BP may terminate this Lease.

- E. <u>Security Deposit</u>. Upon execution of this Lease, Tenant shall post a security deposit in the amount of

    $ __1,000.00__ as security for the faithful performance of all the terms of this Lease. BP shall have the right to increase or decrease the amount of the security deposit upon thirty (30) days prior written notice. It is understood and agreed that BP shall not be required to pay to Tenant interest on the security deposit, except as otherwise required by law. Upon expiration or termination of this Lease, BP shall retain the security deposit for a period of one hundred eighty (180) days to be used to satisfy any outstanding balances or charges incurred by or against Tenant prior to expiration or termination of this Lease, but not received until after that time. The security deposit shall be returned less any funds due to BP from Tenant at the time of such release.

- F. <u>Charges</u>. Tenant must notify BP in writing of any questions or disputes regarding any charges or other items included on any invoice or statement issued to Tenant by BP within sixty (60) days after such invoice or statement is received by Tenant. Unless Tenant provides BP with such written notification, the invoice or statement shall be conclusively presumed to be accurate as of the sixty-first (61st) day following its receipt by Tenant.

5. **TENANT'S IMPROVEMENTS AND EQUIPMENT.** In connection with the operation of the Leased Premises, Tenant shall, at Tenant's expense and in strict accordance with plans and specifications approved by BP, install on the Leased Premises the improvements and equipment agreed to in writing by the parties.

6. **TENANT'S USE OF BP PARCEL.**

    - A. <u>Ingress/Egress/Use</u>. BP grants to Tenant during the term of this Lease for the use and benefit of Tenant's employees, agents, invitees and customers in common with others entitled to use same, a non-exclusive easement over the paved and unimproved portion of the BP Parcel for parking as designated by BP and for ingress and egress to and from the Leased Premises (the "Access Area"), together with a license over the unimproved portion of the BP Parcel for the sole purpose of providing unrestricted access between the Leased Premises and the BP Parcel.

    - B. <u>Conditions of Use</u>. The easement and license rights granted over the Access Area and the BP Parcel are granted and may be exercised only in accordance with the following provisions:

        1) BP shall have the right at any time, and from time to time, to make any change whatsoever to the Access Area which BP in its sole judgment deems advisable, provided such change shall not substantially limit Tenant's access or parking, unless BP provides reasonable alternative access or parking.

        2) Except for the right to terminate this Lease as hereinafter provided in the Condemnation section, Tenant shall not have, or claim any interest in, the Access Area in the event of eminent domain proceedings or settlement in lieu thereof, and if requested by BP, shall execute and deliver to BP an instrument evidencing same.

        3) Tenant shall not in any way interfere with the free flow of traffic over the Access Area, and shall use its best efforts to prevent any blocking of access to or from the pump islands or the BP Parcel.

    - C. <u>Utility Easement</u>. BP further grants to Tenant during the term of this Lease a non-exclusive utility easement for the purpose of tying into, installing, operating, maintaining, repairing or replacing any and all utility lines to serve the Leased Premises. Such easement shall be limited to the area where such utility lines are presently located or to such other location as may be approved by BP in writing, which approval shall not be unreasonably withheld.

7. **BP'S USE OF LEASED PREMISES.** BP reserves an easement and license over the unimproved portion of the Leased Premises for the purpose of providing unrestricted access between the BP Parcel and the Leased Premises for its use and the use of its agents, invitees, and customers in common with others entitled to use same, and a utility easement for the purpose of tying into, installing, operating, maintaining, repairing or replacing any and all utility lines to serve the BP Parcel.

8. **PRIOR USE/ENTRY FOR REMEDIATION.** Tenant expressly acknowledges that it understands that the Leased Premises and/or the BP Parcel have heretofore been used as a retail service station facility dispensing gasoline from underground storage tanks, and may have been impacted by hydrocarbon contamination. Tenant acknowledges that BP has made no warranties or representations regarding the Leased Premises or the Access Area or the condition hereof, and Tenant agrees to accept the Leased Premises and the Access Area in "as is" condition. BP reserves the right to enter upon the Leased Premises for the purpose of engaging in environmental assessment, inspection and remediation as necessary, or as required by governmental authorities.

9. **OPERATING STANDARDS AND PROCEDURES.**

   A. Tenant shall follow and shall cause all of its employees to maintain BP's standards and to follow its policies and procedures as may be amended by BP from time to time, regarding image, merchandising, service, security and safety, acceptance of credit cards, POP signs, sales promotions, upkeep and operation of equipment, customer service and the proper handling of customer complaints.

   1) BP shall loan Tenant one (1) copy of an Operations Manual containing mandatory and suggested specifications, standards and operating procedures prescribed by BP from time to time and information relative to other obligations of Tenant pursuant to this Lease. BP may modify the Operations Manual from time to time to reflect changes in specifications standards and operating procedures for the Fuel Facility. Tenant shall keep its copy of the Operations Manual current by immediately inserting all modified pages furnished by BP. If there is a dispute relative to the contents of the Operations Manual, the master copy maintained by BP at its principal office shall be controlling. Tenant may not at any time copy or unlawfully disclose any part of the Operations Manual.

   2) All electronic equipment used in the operation of the Fuel Facility shall meet BP's specifications and standards as specified in the Operations Manual at Tenant's cost. BP may in its discretion, establish, modify and/or amend such standards, policies and procedures from time to time. Tenant shall pay BP for BP system help desk fees, if any.

   3) Tenant and employees of Tenant shall attend conference and training programs as required by BP for which BP may elect to charge a fee. Tenant shall attend any and all BP marketer conventions and conferences, as required by BP.

   4) All employees of Tenant shall at all times be neat and clean and wear uniforms approved by BP.

   B. Tenant shall maintain and repair all non-fuel-related assets and equipment at the Leased Premises. BP may replace certain non-fuel-related assets or equipment as BP deems necessary in its sole discretion. Tenant shall perform upkeep and maintenance as needed to the Leased Premises, and in so doing shall follow any guidelines outlining proper maintenance which BP may from time to time provide to Tenant. Tenant shall keep the Leased Premises and Access Area, including adjoining areas, alleys, and sidewalks, in a clean, safe and healthful condition. Tenant agrees to maintain the standards of appearance and cleanliness at the Leased Premises as specified by BP from time to time. This includes but is not limited to, daily cleaning; daily removal of debris from driveways; prompt trash removal, snow removal; landscaping care; routine cleaning of light fixtures; and all other routine maintenance as designated by BP. Tenant shall be solely responsible for all repairs resulting from vandalism that occurs at the Leased Premises, including the cost of such repairs. No signs or notices shall be displayed at the Leased Premises unless they are authorized in advance by BP.

   C. Tenant shall not commit nor suffer waste to be committed upon the Leased Premises, and shall not erect or place on the Leased Premises any permanent or temporary buildings, structures, trailers, signs or pennants, nor make any permanent or temporary alterations in, or additions or attachments to the Leased Premises without first obtaining the written consent of BP. If such consent is granted, all such improvements, additions and alterations must meet BP's approved standards for location and appearance.

   D. Tenant shall be fully responsible for and shall repair, replace or reimburse BP for all costs of repair or replacement relating to damage occurring to any portion of the Leased Premises or to the building and fixtures located thereon which occurs during the term of this Lease. Tenant shall at the expiration of this Lease, or upon sooner termination thereof, surrender the Leased Premises to BP in substantially as good condition as when received, ordinary wear and tear excepted.

   E. Tenant shall keep the Leased Premises and BP Parcel free and clear of all mechanics, materialmen and other liens on account of work performed by Tenant or persons claiming under Tenant. Tenant agrees to indemnify, defend and save BP harmless from and against all liability, loss, damage, costs or expense (including reasonable attorneys fees) incurred by reason of any claims of lien by laborers, materialmen or others for work performed or materials and supplies furnished to the Leased Premises for Tenant, or any persons claiming under Tenant.

   F. Any improvements made to the Leased Premises by Tenant with the consent of BP shall remain with the land and title thereto shall revert without cost to BP upon the expiration or sooner termination of this Lease.

   G. Tenant shall comply with and be bound by audit and monitoring procedures which BP may from time to time create and modify to monitor, implement and enforce (a) Tenant's obligations under this Lease and (b) BP's operating standards, policies and procedures. Tenant shall conduct all business operations at the Leased Premises in a manner which meets BP's operating standards, policies and procedures and reflects favorably upon BP.

    H.   BP shall advertise the Leased Business on interstate directional signs and shall invoice Tenant for fifty percent (50%) of the total cost of such signage.

    I.   BP reserves the right to require Tenant to procure and utilize computer systems, including backroom systems, compatible with any computer systems BP designates at Tenant's expense.

### 10. UTILITIES, TAXES, EXPENSES AND FEES.

    A.   Tenant shall pay all utilities including, but not limited to, sewer, water, light, heat and other operating expenses in connection with Tenant's use of the Leased Premises and the operation of the Fuel Facility.

    B.   BP shall pay all real estate taxes on the Leased Premises.

    C.   Tenant shall procure and maintain at its expense in Tenant's name all licenses and permits necessary for all business operations on the Leased Premises. Tenant shall pay any and all fees and occupation or privilege taxes upon or with respect to the maintenance and use of the Leased Premises or with respect to the business, occupation or privilege conducted or exercised upon or in connection with the Leased Premises, as well as any and all taxes upon property owned by Tenant and located thereon.

### 11. LAWS AND REGULATIONS.

    A.   Tenant shall comply fully with all federal, state, and municipal laws, rules, regulations, use permits and all conditions and restrictions with regard to the use and condition of the Leased Premises and with regard to Tenant's activities thereon. Except as expressly permitted herein, Tenant shall not store, handle, use or dispose of hazardous or regulated substances or materials on the Leased Premises. Without limiting the foregoing, Tenant shall comply with all requirements of federal, state and local occupational, health and safety agencies, and environmental protection agencies concerning the receipt, storage, handling, use, sale and dispensing of regulated substances and the disposal of waste materials and Tenant's other activities on the Leased Premises. Tenant shall indemnify and hold BP harmless from all claims, demands, damages, losses, liabilities, actions, costs and expenses (including consultants and attorneys fees) resulting from Tenant's failure to comply with such laws, rules, regulations and requirements.

    B.   Tenant will maintain accessible features and accessible paths of access on the Leased Premises in compliance with all applicable federal, state and local accessibility laws including, but not limited to, the Americans with Disabilities Act ("ADA").

    C.   Tenant will comply with all laws regarding youth access to tobacco. Violation(s) of such laws can constitute grounds for termination or nonrenewal of this Agreement.

### 12. USE OF LEASED PREMISES.

    A.   The Leased Premises shall be used by Tenant as described in Exhibit 3 and for no other purpose without the prior written consent of BP.

    B.   Tenant shall not store upon the Access Area or Leased Premises any wrecked or abandoned vehicles.

    C.   Tenant shall not carry on or permit any offensive, dangerous or unduly noisy trade, business, manufacture or occupation or, any nuisance to the public or to adjoining neighbors.

    D.   Tenant shall not use, store, rent or sell upon the Leased Premises any items of a nature which in BP's judgment, may offend an appreciable segment of the public.

### 13. TRADE IDENTITIES.

    A.   Tenant is licensed to use on a limited and nonexclusive basis the trademarks, trade names, service marks, logos, brand names, trade dress, design schemes, insignia, color schemes and the like ("Trade Identities") designated by BP from time to time only in connection with Tenant's business operations on the Leased Premises during the term of this Lease. BP's Trade Identities include those in use at the time this Lease is entered into by the Parties, as well as those Marks and Trade Identities that BP may subsequently adopt or are the subject of a license to use as may be acquired by BP. Tenant's use of the Trade Identities shall be governed by BP's guidelines, standards, policies and procedures as may be amended by BP from time to time. Tenant understands and agrees that the Trade Identities are trademarks, trade names and service marks exclusively owned by BP or subject to a license to use as may be acquired by BP. Except as expressly provided in this Lease, Tenant shall not acquire any right or license in or to said Trade Identities, and Tenant agrees that the Trade Identities shall be displayed in accordance with BP's standards and policies. Upon termination of this Lease for any reason whatsoever, Tenant shall return all signs, labels and other items containing the Trade Identities to BP.

B. Prior to establishing a Website in connection with Tenant's operation of the Leased Premises, Tenant must submit to BP a sample of the Website information in the form and manner prescribed by BP from time to time. "Website" means an interactive electronic document contained in a network of computer linked by communications software. Tenant shall not establish a Website which has not been approved in writing by BP. Tenant must follow BP's standards and specifications for Websites as prescribed by BP from time to time in the Operations Manual. If Tenant alters its Website previously approved by BP, it must submit to BP a sample of such alterations and receive BP's approval prior to implementing such alterations to the Website.

**14. LIABILITY, INDEMNITY.** Tenant shall be liable for any loss, damage, injury or other casualty to the person or property of anyone, including Tenant, caused in whole or in part by any failure to comply with any term or provision of this Lease or any law or regulation or by any negligence or fault of Tenant, its agents or employees in any way relating to the use, possession or operation of the Leased Premises and/or Access Area. Tenant, for itself, its agents, employees, heirs, personal representatives, successors and permitted assigns specifically agrees to indemnify and hold BP, its parent, affiliates and each of their respective agents, employees, officers, directors, successors and assigns harmless from and against all claims, demands, liabilities, suits or actions (including all reasonable expenses and attorneys' fees, incurred by or imposed on BP in connection therewith) for any such loss, damage, injury or other casualty. BP does not waive and Tenant is not released from any liability or obligation Tenant has or may have to BP or third parties under any prior agreement or lease.

BP, its agents and employees, shall not be liable for any loss, damage, injuries or other casualty of whatsoever kind or by whomsoever caused, to the person or property of anyone (including Tenant) on or off the Leased Premises, arising out of or resulting from Tenant's use, possession or operation thereof, or from defects in the Leased Premises or the Access Area, or the building, fixtures, machinery, equipment or appliances thereon, whether apparent or hidden, or from the installation, existence, use, maintenance, condition, repair, alteration, removal or replacement of any equipment thereon, unless due to the sole negligence of BP, its agents or employees, and Tenant for himself and its agents, employees, heirs, personal representatives, successors and permitted assigns, hereby agrees to indemnify and hold BP, its parent, affiliates and each of their respective agents, employees, officers, directors, successors and assigns harmless from and against all claims, demands, liabilities, suits or actions (including all expenses and reasonable attorneys' fees incurred by or imposed on BP in connection therewith) for any such loss, damage, injury or other casualty.

In no event shall either party be liable to the other for any consequential, incidental, punitive or exemplary losses or damages suffered by the other party. Any action by either party under this Lease must be brought within one (1) year after the cause of action arose. Each party irrevocably waives trial by jury in any action, proceeding or counterclaim, whether at law or in equity, brought by either party.

**15. INSURANCE.**

A. Without limiting Tenant's obligations, Tenant agrees to purchase and maintain at all times, at Tenant's expense and in compliance with any requirements of applicable law, insurance as outlined in this section. This insurance must be satisfactory in form and in substance to BP and must be of least the following minimum kinds and limits:

   1) Commercial general liability insurance, in an amount of at least $1,000,000 per occurrence, covering Tenant's liability for business, operations, use and occupancy of the Leased Premises.

   2) Automobile liability insurance in an amount not less than $1,000,000 combined single limit for any auto used in the Tenant's operations.

   3) Worker's compensation insurance as required by statute, unless Tenant qualifies and remains qualified as a self-insurer under applicable federal and state laws;

   4) Employers' liability insurance with limits of not less than $500,000 for each accident, disease – policy limit, and disease – each employee;

   5) If alcoholic beverages shall be sold at the Leased Premises, liquor liability insurance in an amount not less than $1,000,000 per occurrence.

B. The insurance policies required by Section 15 of this Lease shall be written by companies satisfactory to BP, and shall be primary and non-contributory to any coverage carried by BP. Insurance policies satisfying the requirements of Section 15.A. shall include BP, its parents, subsidiaries and affiliated companies as additional insureds.

C. Tenant agrees to increase the amount of any insurance described herein promptly upon execution of this Lease or upon receiving written notice from BP to do so. In addition, BP reserve the right to require additional types of coverage such as, without limitation, environmental impairment liability insurance to satisfy governmental requirements for financial responsibility. Tenant agrees to obtain such additional insurance promptly upon receiving written notice from BP to do so.

D. Tenant agrees to provide BP with a certificate of insurance evidencing coverage promptly upon request by BP. If Tenant qualifies as a self insurer for purposes of Section 15.A.3 above, Tenant shall furnish BP with evidence of such qualification and any changes thereto, in lieu of the insurance certificate.

E. Tenant shall not materially change, amend, or cancel any of the insurance policies that Tenant is required to obtain under this Lease, without first providing BP with thirty (30) days written notice of the intent to do so, and obtaining BP's prior written consent to such change, amendment or cancellation.

F. The existence or non-existence of any insurance shall not limit Tenant's liability for indemnity and other obligations contained in this Lease.

**16. MORTGAGE, SUBLETTING.** Tenant shall not mortgage or encumber this Lease, or sublet the Leased Premises, or any part thereof, and shall not allow any lien or encumbrance to be placed upon the BP Parcel or the Leased Premises or the leasehold interest hereby created or any part thereof, without first obtaining the written consent of BP. No subletting approved and permitted by BP shall in any manner limit or release Tenant from its obligations under this Lease. Tenant shall immediately pay or satisfy any judgment so as to prevent the Leased Premises from being, and shall not permit the Leased Premises or Tenant's leasehold interest hereunder to be, levied upon, executed upon or vested in any other party by operation of law, a judicial order or otherwise. Tenant shall reimburse BP for any costs and expenses, including attorneys' fees, which are incurred as a result of the violation of the provisions of this section by Tenant.

**17. ASSIGNMENT, FIRST REFUSAL.**

A. Tenant shall have the right to assign this Lease after first obtaining the written consent of BP, which consent shall not be unreasonably withheld. No assignment approved and permitted by BP shall in any manner limit or release Tenant from its obligations under this Lease.

B. BP shall have a right of first refusal to purchase or otherwise acquire Tenant's interest in this Lease and/or Tenant's business as related to this Lease on the same terms and conditions as set forth in any contract entered into by Tenant in any bona fide arms-length transaction. Tenant agrees to submit to BP legible, fully executed copies of all contracts, agreements, side letters and undertakings related to any such transaction. Tenant further agrees to submit to BP such additional information, facts and data as BP deems necessary to assist BP in confirming the bona fide nature of the transaction and to provide BP with a basis for granting any consent to assignment or exercising any right of refusal as provided for herein. BP, at its election, may exercise its right of first refusal in accordance with the provisions of this section or may assign its right of first refusal and/or other rights hereunder to any other person or legal entity. BP has the option to substitute cash for any non-cash consideration offered by a prospective purchaser. BP shall be entitled to customary warranties and representations from Tenant. BP or its assignee shall have thirty (30) business days (i.e., Monday through Friday, excluding all state and federal holidays) from the receipt of fully executed copies of all contracts and related agreements between Tenant and the proposed purchaser and all additional information requested by BP to exercise its right of first refusal hereunder. During said thirty (30) day period, BP's right of first refusal and right to assign such right shall be irrevocable.

C. If BP does not elect to exercise its right of first refusal within the time period provided herein, Tenant may assign this Lease if Tenant obtains BP's prior written consent, which shall not be unreasonably withheld. BP may condition its consent to assignment upon (1) the satisfaction by the proposed assignee of all of BP's then current requirements for the qualification of new tenants including, but not limited to, the assignee's successful completion of BP's Tenant training program; (2) the agreement of the proposed assignee to enter into a BP CM Agreement; (3) payment of the assignment fee charged by BP at the time of the transfer; and (4) simultaneously therewith the execution by Tenant of an assignment of this Lease and associated agreements. In addition, BP may, at its election, condition its consent upon the satisfaction by Tenant of all indebtedness owed by Tenant to BP upon the express agreement of Tenant to remain liable for the observance by the proposed assignee of all terms and conditions hereof, including the payment of Rental. If BP gives its consent to an assignment by Tenant, or if BP agrees to enter into a new Commission Marketer Lease with Tenant's assignee, Tenant shall pay to BP before the Tenant change, BP's administrative cost to effect the Tenant change. This cost is $10,000.00. No administrative fee is due if this Lease is transferred to a successor in interest pursuant to Section 27 if BP assigns its rights to a third party, or if BP exercises its right of first refusal pursuant to Section 17.B.

D. Tenant is the sole owner of the business operations on the Leased Premises and shall not sell, assign or otherwise permit the change of any legal or beneficial interest in said business, including, but not limited to, any sale, conveyance, transfer or assignment of any such interest to a corporation, limited liability company or partnership owned or controlled by Tenant, without the express written consent of BP.

E. Nothing in the above shall constitute a limitation in any manner on BP's right to reasonably withhold its consent to any proposed assignment by Tenant for reasons not mentioned herein or to impose other qualifications to the giving of such consent.

F. It is expressly understood and agreed that BP shall have the right to sell the Leased Premises and/or sell or assign this Lease to a third party, including but not limited to a branded Jobber.

**18. RIGHT-OF-ENTRY.** At any time during the term of this Lease and any holdover period, BP shall have the right, without process of law and without any liability or obligation to the Tenant, to enter upon the Leased Premises and/or the Access Area at any time, with or without notice, for the purpose of inspection of the Leased Premises and/or Access Area, testing and sampling of motor fuels, installing, maintaining, reconditioning and/or replacing BP's underground storage tanks and lines or BP's other improvements or equipment, reading meters, measuring product inventory, or installing, removing or obliterating the Trade Identities wherever displayed, or exercising any rights that BP may have in this Lease or in any other contract or agreement between the parties.

**19. GROUNDS FOR TERMINATION AND NONRENEWAL.**

A. If any of the following events occur, BP shall have the right to terminate or nonrenew this Lease upon ninety (90) days written notice, or such shorter notice as is reasonable under the circumstances or otherwise required by law:

1) Breach by Tenant of any provision of this Lease.

2) Failure to maintain or follow any of the Operating Standards and Procedures as provided in this Lease or any operating standard or procedure issued by BP from time to time.

3) Abandonment of the Leased Premises by Tenant.

4) Failure by Tenant to pay to BP in a timely manner when due all sums to which BP is legally entitled.

5) Death of Tenant, except that Tenant may designate in writing to BP a successor who must at the time of Tenant's death meet BP's selection criteria for operators of Commission Marketer leased businesses.

6) A continuing severe physical or mental disability, or alcohol or drug abuse of Tenant of at least three (3) months duration (or such shorter duration which under the facts and circumstances constitutes an unreasonable period of time) which renders Tenant unable to provide for the continued proper operation of the Leased Premises.

7) The incurring of unauthorized indebtedness on BP's behalf.

8) Insolvency of Tenant or the filing of a voluntary petition in bankruptcy by, or an involuntary petition in bankruptcy against, Tenant, judicial determination that Tenant is bankrupt or insolvent or any other reasonably convincing evidence of financial distress of Tenant, such as, without limitation, appointment of a receiver for Tenant, assignment by Tenant for the benefit of creditors and the like.

9) Removal of, or significant reduction in, Tenant's assets located on the Leased Premises to the prejudice of BP's right of distraint.

10) Destruction of all or substantially all of the Leased Premises.

11) Loss of BP's right of possession of the Leased Premises.

12) Failure to comply with all applicable laws or regulations.

13) Decision by BP to withdraw from Commission Marketer operations in the geographic area of the Leased Premises. In the event BP specifically designates its decision to withdraw from Commission Marketer operations as the grounds for termination and BP has not also decided to withdraw from marketing through lessee-dealers in the geographic area of the Leased Premises, BP shall offer Tenant the option to become a lessee-dealer on BP's then current forms.

14) Decision by BP to sell the Leased Premises and BP Parcel for a use other than the sale of BP or Amoco-branded petroleum products. In such event BP shall make a bona fide sale offer or give a right of first refusal to Tenant.

B. If any of the following events shall occur, BP may terminate this Agreement immediately upon written notice:

1) Conviction of Tenant of any felony.

2) Fraud or criminal misconduct by the Tenant or Tenant's employees relevant to the operation of the Leased Premises.

3) Failure to comply with environmental and/or safety standards or procedures established by governmental authorities.

4) Failure to operate the business on the Leased Premises for seven (7) consecutive days or such lesser period of time as may be reasonable under the circumstances.

5) Failure to comply with standards and specifications more than twice in any twelve (12) month period, regardless of whether such defaults are cured.

6) Failure to successfully complete the training program.

7) Giving of one (1) or more insufficient funds checks and/or payments within any twelve (12) month period.

C. BP shall not be obligated to continue the sale of its motor fuels from the Fuel Facility if it should make a determination to withdraw from marketing of motor fuels under the BP trademark or trade name at retail outlets in the geographic area of the Leased Premises. In such event, BP may terminate this Lease upon one hundred eighty (180) days notice.

D. This Lease shall terminate upon the termination, nonrenewal or expiration, for any reason, of the CM Agreement. Tenant acknowledges and understands that upon the termination, nonrenewal or expiration of this Lease and/or the CM Agreement, BP may discontinue operations at the Leased Premises and BP Parcel or may continue in possession and operate them with its own employees or establish operations by a contractor, Tenant and/or jobber and may, without limitation, transfer, operate or use the Leased Premises and BP Parcel in any manner for any purpose.

## 20. TERMINATION, NONRENEWAL, REMEDIES.

A. On the termination or expiration of this Lease or any renewal or extension thereof, BP, at any time thereafter, shall have the right, at BP's election, either with or without process of law, to enter upon the Leased Premises and BP Parcel and take possession of the same, and to remove any merchandise and other personal property situated thereon, including the right to use such force as may be necessary to effectuate the actual possession thereof in BP, and such entry shall not be regarded as a trespass or be sued for as such or be regarded as in any way unlawful.

B. BP, in addition thereto, may, at its option, declare all unpaid rentals for the entire term of this Lease to be due and payable, offset against any sums due Tenant from BP and/or sue for and recover all damages accrued or accruing under this Lease, or arising out of any violation thereof, and BP may so offset and/or sue and recover without declaring this Lease void or entering into possession of the Leased Premises.

C. BP may pursue any other remedies available at law or in equity for any violation of this Lease or any of its covenants by Tenant.

D. The above enumerated remedies are concurrent and are at the option and discretion of BP, and the pursuit of any one shall not amount to an election or bar the pursuit of any other remedies, whether or not enumerated herein. Termination of this Lease or the CM Agreement shall not affect or abridge in any way the rights and obligations of the parties accruing prior to termination.

**21. CONDEMNATION.** If, during the term of this Lease, the entire or a substantial part of the Leased Premises, the improvements thereon or the BP Parcel are taken by eminent domain proceeding or similar proceeding or settlement in lieu thereof ("Condemnation"), or if access is taken by Condemnation and adequate substitute access not provided, then this Lease may be terminated by BP or Tenant as of the date of delivery of the condemned property to the condemning authority. Such termination shall be made by notice to the other Party at least thirty (30) days prior to the date of delivery of possession, or such shorter notice as may be reasonable under the circumstances. In the event that any part of the Leased

Premises or improvements thereon are taken as a result of Condemnation, the total award thereof or proceeds thereof shall be distributed solely to BP with no reimbursement to Tenant; provided, however, that Tenant shall be entitled to, as Tenant's sole award for damages, (a) the value of any improvements and equipment constructed or installed on the Leased Premises by Tenant and taken as a result of Condemnation, and (b) if a separate award was made by the condemning authority for relocation costs of Tenant, such award shall be distributed to Tenant, and (c) if any compensation is received by BP specifically based upon loss of business opportunity or goodwill, BP shall fairly apportion such compensation between BP and Tenant. In the event any part of the Access Area or the BP Parcel are taken as a result of Condemnation, the total award or proceeds thereof shall be distributed solely to BP with no reimbursement to Tenant. If requested by BP, Tenant shall execute and deliver to BP an instrument evidencing the agreement set forth herein. Tenant waives the provisions of any law, ordinance, statute or rule which would change the rights and obligations of the parties in the event of a Condemnation from that set forth herein.

**22. MATTERS OF RECORD, ZONING.** This Lease shall be subject to all mortgages, building and zoning regulations, use restrictions, and to any underlying leases, covenants, conditions, easements and other liens and encumbrances affecting BP's title to the Leased Premises or the Access Area at the date of execution hereof. This Lease shall be subject to all zoning restrictions of every nature affecting the Leased Premises and the Access Area at the date hereof or hereinafter imposed during the term of this Lease.

**23. HOLDOVER.** In the event Tenant shall hold over beyond the expiration or any termination date of this Lease, such hold over tenancy shall be at sufferance and shall in no way color the Tenant's possession with any right of tenancy, and it is expressly understood and agreed between the parties that the rights accruing to either by reason of appropriate notice of termination shall not be waived and shall continue in full force and effect. It shall be the responsibility of Tenant, if Tenant remains in possession without BP's consent, to pay as liquidated damages a sum, computed on a daily basis, equal to three times the last rental rate provided for herein.

**24. VACATION OF PREMISES, TENANT'S PROPERTY.** Tenant agrees to vacate the Leased Premises and BP Parcel on the effective date of the termination or expiration of this Lease or the CM Agreement, remove any inventory, equipment, machinery, tools, goods, products and supplies belonging to Tenant, subject to the provisions of this Lease and the CM Agreement, and surrender the premises to BP in as good condition as when received, normal wear and tear excepted. If removal of Tenant's property causes any damage, BP may repair such damage at Tenant's expense. In the event Tenant fails to remove any such items owned by it within 10 days after the effective date of the termination or expiration of this Lease or the CM Agreement, title thereto shall pass to BP without notice and without cost or charge and Tenant waives any claims for such items.

**25. RELATIONSHIP OF THE PARTIES.** Tenant acknowledges and understands that in the absence of the personal commitment of the undersigned individual to the operation of the Leased Premises, BP would not have entered into this Lease. BP retains the right at all times to market motor fuels, merchandise and services in the area of the Leased Premises at other locations, including but not limited to establishing its own employee operated retail facilities, Tenant operated facilities, contractor operated facilities, other Leased Business facilities and/or jobber supplied retail facilities.

**26. AUDITING.** BP shall have the right at all times to inspect motor fuels, books and records in the possession or control of Tenant to determine amounts owed BP and/or compliance with this Lease and all related agreements.

**27. SUCCESSOR IN INTEREST DESIGNATION.** Tenant designates the following as a Successor in Interest to any relationship between Tenant and BP resulting from this Lease:

Primary Successor in Interest

Name: _LYAS BAGA_

Address: _316 8th St Fairway_

Birth Date: _____

Relationship to Dealer: _Brother._

Alternate Successor in Interest

Name: _RYM BAGA_

Address: _316 8th St FAYway_

Birth Date: _____

Relationship to Dealer: _Sister._

Tenant acknowledges that designated successors in interest shall be considered as a Tenant candidate provided they meet BP's then current standards and qualifications for Tenant candidates. BP reserves the right to request additional documentation to verify designees.

**28. SOFTWARE** BP hereby grants to Tenant a non-exclusive license to use any software provided to Tenant by BP for use in conducting Tenant's business under the Lease and the CM Agreement. This license shall not be deemed to transfer any other right, title or interest in or to such software and all such rights, title and interest are expressly reserved by BP.

**29. NO WAIVER.** No failure to act on an incident of breach, and no course of dealing shall be construed as the waiver of the right to act. The waiver of any breach of any covenant, condition or stipulation contained herein shall not be taken to be a waiver of any subsequent breach of the same or any other covenant, condition or stipulation. Any failure of BP to enforce rights or seek remedies upon any default of Tenant with respect to any of the obligations of Tenant hereunder, shall not prejudice or affect the rights or remedies of BP in the event of any subsequent default of Tenant.

**30. NOTICES.** Any notice provided for herein shall be considered properly given if: (a) mailed by certified mail return receipt requested or private express mail service (such as Federal Express) to the other party at the address listed in this Lease or at such other address as such party may from time to time designate by written notice to the other party; (b) hand delivered to the Tenant or the Leased Premises; or (c) sent by facsimile provided that a confirmation copy is sent by private express mail service on the same day. The effective date of any notice shall be the first of (a) the date the notice is mailed by certified mail or private express mail service; (b) the date of delivery of the notice to Tenant or the Leased Premises; or (c) the time the notice is sent by facsimile.

**31. ENTIRE AGREEMENT.** This Lease cancels and supersedes all prior written and unwritten agreements and understandings between the parties pertaining to the matters covered in this Lease. No obligation, agreement or understanding shall be implied from any course of dealing or from any of the terms and provisions of this Lease, all obligations, agreements and understanding with respect to the subject matter hereof being expressly set forth herein. No representations or statements, other than those expressly set forth herein, were relied upon by the parties in entering into this Lease. No modification or waiver of, addition to, or deletion from the terms of this Lease shall be effective unless reduced to writing and signed by Tenant and a representative of BP authorized to execute this Lease.

**32. SEVERABILITY.** If, for any reason any portion of this Lease is held to be invalid, contrary to, or in conflict with any applicable present or future law, the remaining portions of this Lease, to the extent practicable, shall remain in effect to the extent permissible under such law. If any applicable law requires a greater prior notice of termination or other action than is required hereunder or the taking of some other action not required hereunder, or if under any applicable law any provision of this Lease or any specification, standard or operating procedure is invalid or unenforceable, such notice and/or other action required by such law shall be substituted for the comparable provisions hereof.

**33. FORCE MAJEURE.** Neither party shall be liable for delays or nonperformance caused by an event which cannot be reasonably foreseen or prevented, including without limitation, unavailability, failure or delay of transportation; labor difficulties, fire, riots, war conditions in any country, compliance with any governmental order, regulation, recommendation, request or allocation program (whether voluntary or involuntary), material or labor restrictions by any governmental authority or any Act of God affecting directly or indirectly either party's ability to perform hereunder. Settlement of strikes shall be at the discretion of the party so affected.

Witness: _[signature]_

BP Products North America Inc.

By: _[signature]_
Michael Mulhern

Its: Regional Account Executive

Witness:

Tenant: _[signature]_
Hagop Baga

bp

S.S. Number
1-00-03396-013

**EXHIBIT 3**
**Purpose and Use of**
**Leased Premises**
(4-2003) W

Use of Leased Premises:
Garage/Scnack Shop

General description of Merchandise and/or Services to be sold at the Leased Premises:

The Dealer Sells, windshield fluid, Gas treatment, antifreeze, oils, soda and candy bars.

**bp**

S.S. Number
1-00-03396-013

**EXHIBIT 4**
**Commission Marketer**
**Lease State Addenda**
(4-2003) W

## ADDITIONAL STATE DISCLOSURES (CHECK APPLICABLE REVISION)

If the Leased Business is located in any of the following states, then the designated provision in the Agreement shall be amended as follows:

### ILLINOIS

The Agreement is amended by an additional "Miscellaneous" Section to the end of original language that appears therein:

1. "Section 4 of the Illinois Franchise Disclosure Act dictates that any provision in a franchise agreement which designates jurisdiction or venue in a forum outside of this state is void with respect to any cause of action which otherwise is enforceable in this state, provided that a franchise agreement may provide for arbitration in a forum outside of this state."

2. "Any governing law or choice of law clause granting authority to a state other than Illinois effectively negates the Illinois Franchise Disclosure Act. Therefore, the franchise agreement shall be interpreted and construed under the Illinois Franchise Disclosure Act."

3. "Section 41 of the Illinois Franchise Disclosure Act states that any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this Act is void."

Witness: _____

BP Products North America Inc.

By: _____
Michael Mulhern

Its: Regional Account Executive

Date: 3/24/04

Witness: _____

Tenant: _____
Hagop Baga

Date: 03/24/04



S.S. Number
1-00-03396-013

**EXHIBIT 5**
**Consent to Assignment**
**of Lease Agreement**
(4-2003) W

**THIS CONSENT TO ASSIGNMENT** pertains to the Lease Agreement dated _____,

between BP Products North America Inc., a Maryland corporation, therein and herein referred to as "BP," and

_____Hagop Baga_____ therein and herein referred to as "Tenant," relating to the premises situated at

_____341 Gorge Road, Cliffside Park NJ 07010_____.

**Witnesseth,** that said Lease Agreement (hereinafter referred to as the "Lease") shall be subject to the further terms and conditions, to wit:

Consent is hereby given by BP to Tenant to assign the Lease to

_____, a (an) _____
corporation-partnership-limited liability company (strike whichever is inapplicable) subject to the following terms and conditions:

1. That a true copy of said assignment shall be delivered to BP upon its execution by the parties thereto, but in no event later than five (5) days from the date hereof.

2. That the assignment shall provide that the assignee, in consideration of BP's consent to the assignment, shall promise and agree to be bound by and subject to all the terms and conditions in the Lease between BP and Tenant identified above and to perform all the duties and covenants of Tenant and to assume all the liabilities of Tenant therein.

3. That Tenant, as principal, officer or employee of said corporation (partnership or limited liability company) shall in good faith during the whole of the term of the instrument, and any renewals or extensions thereof, devote his personal attention, as his major occupation, to managing the business activities referred to in the Lease.

4. That Tenant and all other shareholders (general partners or members) shall personally guarantee payment of the debts, if any, owed to BP by the said assignee incident to the assignee's use of the premises and any dealings with BP relative thereof.

5. That Tenant is the owner of all or a majority of the capital stock of said corporation (or a partner or member having a majority active interest in said partnership or limited liability company) on the date hereof and that Tenant shall not sell, transfer, give or otherwise dispose of any of said capital stock (or his interest in said partnership or limited liability company) during the term of the Lease or any renewal thereof. Violation of this covenant shall give BP the immediate right to terminate this Consent to Assignment upon five (5) days notice given in accordance with the provisions of the Lease.

6. That nothing herein contained shall release Tenant from any of Tenant's obligations, covenants or conditions of the Lease between BP and Tenant identified above.

WITNESS:

_____

BP PRODUCTS NORTH AMERICA INC.

By: _____
Michael Mulhern

Title: __Regional Account Executive__

WITNESS:

_____
Zelu Zaker Dicene

TENANT:

_____
Hagop Baga

_____
Hagop Baga

Accepted and Agreed to on this date, _____, by the above-named assignee.

WITNESS:

_____
Zelu Zaker Dicente

ASSIGNEE:

By: _____

Title: __03/24/04__